SO ORDERED: April 11, 2016.



**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MATTHEW M. STEELE, | ) | Case No. 14-90727-BHL-7 |
| and ANGELA M. STEELE, | ) | |
|     Debtors. | ) | |
| | ) | |
| DIRECT CAPITAL CORPORATION, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW M. STEELE, | ) | Adv. Proc. No. 14-59032 |
| and ANGELA M. STEELE, | ) | |
|     Defendants. | ) | |

**MEMORANDUM OF DECISION**

Plaintiff Direct Capital Corporation ("Direct Capital") commenced this adversary proceeding by filing a Complaint to Determine Dischargeability (Doc. 1) against Debtor-Defendants Matthew M. Steele and Angela M. Steele (together, the "Steeles") on October 6, 2014. The matter was tried before this Court on September 24, 2015. At the conclusion of the trial, the Court directed Steven Lohmeyer, counsel for Direct Capital, to attempt to contact Donald Holden to inquire about the status and location of the collateral at issue in this case. Mr. Lohmeyer filed an Affidavit (Doc. 46) on October 27, 2015, in which he reported that his

1

attempts to contact Mr. Holden were unsuccessful. Having reviewed the Pleadings, Exhibits, oral testimony, and arguments of counsel, the Court hereby finds that Judgment should be, accordingly, entered in favor of the Defendants Matthew M. Steele and Angela M. Steele.

### FINDINGS OF FACT

This adversary proceeding stems from a February 2008 financing agreement between Direct Capital and KoC of Cincinnati ("KoC"). KoC was a corporation in the business of heavy equipment and machinery rentals and parts sales. The Steeles were for a time officers and non-voting shareholders of KoC. Angela Steele served as President and Matthew Steele served as Vice President.

On February 29, 2008, KoC entered into a lease agreement with purchase option (the "Financing Agreement") with Direct Capital for the acquisition of three New Holland L-170 Skid Steer Loaders (the "Loaders"). The Financing Agreement provided for a 60-month lease term, with monthly payments of $1,529.93 due to Direct Capital and a one dollar purchase option at completion. Direct Capital retained a security interest in the three Loaders. KoC acquired the rights to possession of the Loaders and was allowed to sublease or rent out the Loaders under the terms of the Financing Agreement. KoC assumed the responsibility of maintaining knowledge and records of the location of each Skid Steer Loader, and agreed to report the location to Direct Capital upon request. The Financing Agreement and its addendums, exhibits, and schedules were all signed by Angela M. Steele as President of and on behalf of KoC. Angela Steele held valid authority to contract with Direct Capital on behalf of KoC pursuant to a Resolution of Authority which was signed by Matthew Steele as Vice President of KoC.

Both Angela and Matthew Steele also signed, in their individual capacities, a master guaranty provision (the "Personal Guaranty") on the final page of the Financing Agreement. By signing this provision, the Steeles personally guaranteed that KoC would make all payments and meet all obligations required under the Financing Agreement fully and promptly. Further, the Steeles assumed personal liability in the event of KoC's default, agreeing to immediately

pay Direct Capital in accordance with the default provisions of the Financing Agreement and to perform all of KoC's obligations thereunder. After entering the Financing Agreement, KoC utilized the Loaders in its equipment rental business.

The Steeles testified that they parted ways with KoC around 2010. KoC's business had declined following the recession of 2008-2009 and KoC began withholding pay from the Steeles. The Steeles decided to walk away from KoC to seek employment and more reliable income elsewhere. Angela Steele's Father, Donald Holden, and her sister, Andrea Holden, remained with KoC. According to the Steeles, KoC continued to operate for a time after their departure.

Sometime after entering the Financing Agreement, KoC began to miss monthly payments for the Loaders. Due to KoC's continued default, Direct Capital initiated Cause No. 15C01-1307-CC-301 in Dearborn County Circuit Court seeking to enforce the Steeles' Personal Guaranty. In September 2013, Direct Capital obtained a default judgment against the Steeles in that action for $36,562.50 plus costs. Direct Capital also made a number of unsuccessful attempts to retrieve the collateral Loaders prior to the Steeles' bankruptcy.

The Steeles stated that Direct Capital's state court judgment against them is what led to their chapter 7 bankruptcy in April 2014. Direct Capital did not learn of the bankruptcy until August 2014 as it was not initially scheduled as a creditor. Upon learning of the Steeles' bankruptcy, Direct Capital again made demand upon the Steeles for the return of the Loaders but was advised that the Loaders were gone. Direct Capital initiated this adversary proceeding to determine the dischargeability of the debt arising from the Steeles' Personal Guaranty on the Financing Agreement. In the complaint, Direct Capital alleges that the Steeles converted the Loaders to their own use or sold the equipment and converted the proceeds to their own use. In a letter to the Court dated January 17, 2015 and filed shortly before the Steeles' answer, the Steeles stated that "the collateral listed in the complaint belonged to Angela's father and his company. The collateral was never in our sole possession and we did not sell the collateral. We left the company with nothing."

3

At trial, the Steeles testified that they have no actual knowledge of the present location of the Loaders. The Steeles stated that they were in fact officers of KoC and acted with authority on behalf of KoC when they entered the Financing Agreement. According to the Steeles, their knowledge of the Loaders ended with their exit from KoC. The Steeles testified that KoC retained possession of the Loaders upon their departure around 2010 but the Steeles do not know what subsequently happened to the equipment. KoC is now closed and is no longer in business. However, the Steeles also testified that Donald Holden is now operating the same business under the structure of a new organization named "KOC Limited." The Steeles' best guess as to the present location of the Loaders is that they would be in the possession of KOC Limited or Donald or Andrea Holden. The Steeles could not confirm whether the Loaders were in the possession of KOC Limited because they have a broken relationship with Donald and Andrea Holden and, according to Matthew Steele, the "lines of communication are very poor."

At the conclusion of the trial, the Court instructed Steven Lohmeyer, counsel for Direct Capital, to attempt to contact Donald and Andrea Holden and KOC Limited to inquire about the status and location of the Loaders. Counsel filed an Affidavit (Doc. 46) on October 27, 2015, in which he states that a search of business records at the Office of the Secretary of State revealed the existence of a KOC Limited located at 5885 State Route 128, Cleves, Ohio; that he sent letters to Donald Holden, Andrea Holden, and Chief Executive Officer of KOC Limited at the foregoing address; that he received no responses; that an inspection agent reported a different heavy equipment company operating at the foregoing address; and that there was no sign of a KOC Limited, Donald or Andrea Holden, or the Loaders at the site. The Loaders appear to be unrecoverable.

## CONCLUSIONS OF LAW

This adversary proceeding arises under the Steeles' Chapter 7 bankruptcy case. As a determination of the dischargeability of a debt, the matter is a core proceeding over which this

4

Court has jurisdiction pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(I). In order to prevail, Direct Capital must have proved by a preponderance of the evidence that the Steeles' liability arising from the Personal Guaranty is excepted from discharge under § 523. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Direct Capital contends that the Steeles' actions in converting the Loaders or proceeds of the Loaders to their own use constitute fraud, fraud or defalcation while acting in a fiduciary capacity, theft or larceny, and conversion. According to Direct Capital, the debt arising from the Steeles' Personal Guaranty in the Financing Agreement is therefore nondischargeable under §§ 532(a)(2), (a)(4), and (a)(6).

**A. Section 523(a)(2)**

Direct Capital first alleges that the Steeles committed fraud which excepts the debt from discharge under § 523(a)(2). Direct Capital does not specify whether the Steeles' actions constituted fraud under subsection (A) or (B) of § 523(a)(2). Because the transaction underlying the debt was between Direct Capital and KoC and there is no evidence that the transaction involved disclosure of the Steeles' financial condition, the Court finds that § 523(a)(2)(B) is inapplicable here and will limit analysis to § 523(a)(2)(A).

Section 523(a)(2)(A) precludes the discharge of any debt "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To render a debt nondischargeable under this section, Direct Capital must prove that (1) the Steeles made a false representation or omission, (2) that the Steeles (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which Direct Capital justifiably relied. *Ojeda v. Goldberg*, 599 F.3d 712, 716–17 (7th Cir. 2010).

The Court understands Direct Capital's fraud allegation to be that the Steeles either misrepresented themselves as officers of KoC or misrepresented KoC as buyer when entering

5

the Financing Agreement, and that they did so with the intention of inducing Direct Capital to finance the purchase of the Loaders for the Steeles' own use and benefit. The Court is not convinced that the Steeles engaged in fraud in the inducement here. To the contrary, the evidence suggests that the Steeles were in fact officers of KoC and entered the Financing Agreement with valid authority on behalf of KoC. The Steeles' testimony, the Resolution of Authority granting Angela Steele the power to transact on behalf of KoC, and the Financing Agreement completed in the name of KoC all support that conclusion. Direct Capital did not offer any evidence to prove that the Steeles were not employed by KoC, that the Steeles were not authorized to transact on behalf of KoC, or that KoC was not the true buyer. Further, the Steeles testified that the Loaders were utilized by KoC as rental equipment and that KoC retained the Loaders upon the Steeles' departure from the business.

Notwithstanding any subsequent default and mishandling of the Loaders, the Financing Agreement appears to be a valid lease-purchase contract between KoC and Direct Capital rather than a product of the Steeles' fraud. As such, the Court finds that the Steeles did not make a false representation or omission when entering the Financing Agreement on behalf of KoC. Because the transaction did not involve misrepresentation, the Court need not address the subsequent elements required for a finding of fraud under § 523(a)(2)(A). The Court finds that the debt arising from the Steeles' Personal Guaranty in the Financing Agreement is not excepted from discharge under § 523(a)(2).

### B. Section 523(a)(4)

Direct Capital next asserts that the debt should be excepted from discharge under § 523(a)(4). Section 523(a)(4) precludes the discharge of any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." While not pursued at trial, Direct Capital's assertions in the complaint suggest that the Steeles engaged in fraud or defalcation while acting in a fiduciary capacity or committed larceny.

6

To except the debt from discharge for the former, Direct Capital must show that (1) that the Debtor(s) acted as a fiduciary to the creditor at the time the debt was created, and (2) that the debt was caused by fraud or defalcation. *In re Berman*, 629 F.3d 761, 766 (7th Cir. 2011). The presence of a "fiduciary capacity" is the foundation of the claim, and it requires something more than a debtor-creditor relationship. *In re Richards*, No. 12-90694-BHL-7, 2013 WL 6198201, at *4 (Bankr. S.D. Ind. Nov. 27, 2013). The Steeles were not fiduciaries obligated to act in the best interest of Direct Capital and the relationship did not involve any "special confidence" that the Seventh Circuit requires to fit within the exception. *See In re Berman*, 629 F.3d at 771.

Likewise, the record does not support a finding of larceny in this case. "Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner." *Matter of Rose*, 934 F.2d 901, 903 (7th Cir. 1991). The Steeles testified that it was KoC, the true buyer of the Loaders, that kept the equipment upon the Steeles' departure from the company. Direct Capital did not produce any evidence to the contrary or in support of its allegation that the Steeles themselves wrongfully took the Loaders. Because the Steeles were not in a fiduciary relationship with Direct Capital and did not commit larceny, the Court finds that the debt arising from the Steeles' Personal Guaranty in the Financing Agreement is not excepted from discharge under § 523(a)(4).

### C. Section 523(a)(6)

Finally, Direct Capital contends that the Steeles' liability arising from the Personal Guaranty is nondischargeable under § 523(a)(6) as a debt for willful and malicious injury to another or to the property of another. Direct Capital's argument under this section is based upon the Steeles' alleged conversion of the Loaders or the proceeds of the Loaders. To establish nondischargeability under § 523(a)(6), Direct Capital must show (1) an injury caused

7

by the Steeles (2) willfully and (3) maliciously.  *See First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013).

As applied in the context of a taking, the Court has previously concluded that a creditor must show that a debtor "deliberately or intentionally deprives another of his property in conscious disregard of his duty to return the property or without just cause or excuse[, and that a] debtor does not need to intend that the creditor be harmed financially."  *In re Baker*, No. 10-90127-BHL-7, 2011 WL 4549172, at *9 (Bankr. S.D. Ind. Sept. 28, 2011)(quoting *Garoutte v. Damax, Inc.*, 400 B.R. 208, 213 (S.D. Ind. 2009)).  Despite their contractual duty to at least maintain knowledge of the location of the Loaders, the Steeles' conduct falls short of a willful and malicious injury.

In *Baker*, the debtor and her husband unlawfully took $691,757.78 of fuel from the creditor, *id.* at 5, and in *Garoutte*, the debtor failed to return a plane which he had disassembled for repairs in advance of an unsuccessful sale.  *Damax v. Garoutte*, No. 07-70720-BHL-7, Adv. No. 07-57218 (Bankr. S.D. Ind. Jan. 31, 2013).  Those cases involved clear instances of conversion where the debtor took direct action to intentionally exert unauthorized control over property of a creditor.  In both instances, the Court found the debts arising from conversion to be excepted from discharge under § 523(a)(6) as the takings met the foregoing standard for willful and malicious injury.

In this case, unlike *Baker and Garoutte*, the Steeles were never in personal possession of Direct Capital's property and did they not take any affirmative action to deliberately or intentionally deprive Direct Capital of the Loaders.  The burden is on Direct Capital to prove willful and malicious injury.  *See Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir. 1992).  Direct Capital did not offer evidence proving anything more than that the Steeles' failed to maintain knowledge of the location of the Loaders and neglected to assist Direct Capital in retrieving them.  KoC was the buyer and owner of the Loaders.  The Steeles walked away empty-handed from KoC in 2010.  According to the Steeles, their relationship with Donald and Andrea Holden

8

is broken and there is little to no communication between the parties. Upon walking away from KoC, it was not unreasonable for the Steeles to assume that the company would continue to operate and that KoC would maintain primary responsibility for the Loaders. If there was an act of conversion here, it would appear to have been committed by KoC or its principals who were primarily liable for the Loaders and maintained possession of them after the Steeles' departure.

Furthermore, there is no evidence that the Steeles' wrongdoing – failing to maintain knowledge of the location of the Loaders or to assist Direct Capital in retrieving the Loaders – was willful and malicious. Pursuant to the Personal Guaranty, the Steeles assumed KoC's obligations under the Financing Agreement following KoC's default. Among those contractual obligations undertaken by the Steeles was a duty to maintain the collateral or at least maintain knowledge of its location. Direct Capital did not produce evidence suggesting that the Steeles neglected this duty willfully or maliciously. The Steeles testified that they last had knowledge of the Loaders when they walked away from KoC and that the Loaders were on KoC premises at that time. The Steeles apparently did not make an effort to locate the collateral and they did not assist Direct Capital in any attempt to retrieve the Loaders thereafter. While the Steeles' inaction in the face of Direct Capital's attempts to enforce the Personal Guaranty and recover the Loaders is regretful, such inaction was at most negligent or reckless. The Steeles' testimony on the whole suggests that they did not appreciate the gravity of their situation with respect to the Loaders in the wake of their failed relationship with KoC and the Holdens. The testimony does not reflect a calculated effort to deprive Direct Capital. Given their broken relationship with the Holdens and the fact that the "lines of communication are very poor," any effort by the Steeles to ascertain the location of the Loaders may well have been futile.

Generally, "an injury is willful within the meaning of section 523(a)(6) only if intended; if it's the result but not the *intended* result of an intentional act, the debt arising from the injury is dischargeable, even if the injury was the result of a reckless act." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 321 (7th Cir. 2012)(citations omitted). Several courts have declined to except

9

from discharge under § 523(a)(6) claims arising from a debtor's failure to return collateral where the collateral was in the possession of a third party and the evidence did not demonstrate the debtor's intent to deprive the creditor. The debt at issue in *In re Juma* 530 B.R. 682 (Bankr. N.D. Ill.) *aff'd sub nom. R & J Constr. Supply Co., Inc. v. Juma*, 542 B.R. 237 (N.D. Ill. 2015) arose from the debtor's failure to return concrete forms for which he was primarily liable to a creditor. The debtor, who was the inexperienced financier of a construction partnership, had submitted a credit application to the creditor to allow his partner to obtain equipment. *Id.* at 686. His partner then rented concrete forms without the debtor's knowledge. *Id.* The forms were never recovered from the partner after default. *Id.* at 687. The court held that the conversion debt was not one for willful and malicious injury because there was no showing that the debtor had any intent to injure or that his actions were taken with the knowledge that the creditor was substantially certain to be injured. *Id.* at 694. Further, there was no showing that the debtor acted in conscious disregard of his duties. *Id.* at 693-94.

In another case, *In re Clementi*, 58 B.R. 167 (Bankr. E.D. Wis. 1985) the debtor had financed the purchase of a Honda all-terrain vehicle with a creditor. Because she lived in an urban area in which she could not use the vehicle, the debtor decided to keep the vehicle at a friend's rural home where it might be more readily used. *Id.* at 168. After her default, the debtor was not able to retrieve the vehicle from her friend. *Id.* at 169. Although the debtor's failure to maintain possession of the vehicle was clearly a breach of contract, the court held that the debt was not excepted from discharge under § 523(a)(6). *Id.* The debtor "undoubtedly exercised poor judgment in leaving the Honda with [her friend], but she did not anticipate his actions in refusing to return the Honda, and when he did, she did her best to get it back. Certainly, it has not been shown that she knew much less intended that leaving the Honda with [her friend] would cause an injury to the plaintiff." *Id.*

Similarly, the Court finds that the Steeles, who were only guarantors and were never in possession of the Loaders, did not take any direct action intended to deprive Direct Capital of its

10

property and their breach of any contractual duty to Direct Capital was at most negligent or reckless. Thus, the Court concludes that the Steeles' conduct does not meet the standard for willful and malicious injury in the context of a taking as adopted in *Garoutte* and *Baker*. The debt arising from the Steeles' Personal Guaranty in the Financing Agreement is not excepted from discharge under § 523(a)(6).

## CONCLUSION

Based upon the foregoing, the Court concludes that the debt owing to Direct Capital is **DISCHARGEABLE**, and Judgment shall accordingly be entered in favor of Defendants Matthew M. Steele and Angela M. Steele.

###